### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

#### Case No. 22-cv-62298-BLOOM/Hunt

ROBIN DUNCAN,

     Plaintiff,

v.

NORTH BROWARD HOSPITAL
DISTRICT *doing business as*
BROWARD HEALTH,

     Defendant.

_____/

### <u>OMNIBUS ORDER</u>

**THIS CAUSE** is before the Court upon two separate Motions: (1) Defendant Broward

Health's Motion for Summary Judgment, ECF No. [25], filed on December 20, 2023; Plaintiff

Robin Duncan filed a Response in Opposition, ECF No. [49] ("Response"), to which Defendant

filed a Reply, ECF No. [50] ("Reply"); and (2) Defendant's Motion *in Limine*, ECF No. [33], filed

on December 20, 2023; Plaintiff did not respond to the Motion *in Limine*, despite the Court issuing

an Order to Show Cause on January 4, 2024, ECF No. [35]. The Court has reviewed the Motions,

all opposing and supporting submissions,[1] the record in this case, the applicable law, and is

otherwise fully advised. For the reasons set forth below, Defendant's Motion for Summary

Judgment is granted. Defendant's Motion *in Limine* is denied as moot.

---

[1] Defendant filed a Statement of Material Facts, ECF No. [26], with its Motion for Summary Judgment.
Plaintiff simultaneously filed a Response to Defendant's Statement of Material Facts in Opposition to
Defendant's Motion for Summary Judgment and an Affirmative Statement of Facts, ECF No. [41].
Defendant then filed a Reply to Plaintiff's Statement of Material Facts. ECF No. [51].

## I.  BACKGROUND

Plaintiff brings claims against her former employer, Broward Health, for disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") (Count I); retaliation under the Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"); race and disability discrimination under the Florida Civil Rights Act, Fla. Stat. § 760 *et seq.* ("FCRA"); (Counts II and IV); race discrimination under Title VII of the Civil Rights Act, 42 U.S.C. §2000e *et seq.* ("Title VII") (Count III); and interference with FMLA rights (Count V). Defendant seeks summary judgment on all Counts. ECF No. [25]. Plaintiff opposes summary judgment except on the FCRA counts, which she concedes were not administratively exhausted. ECF No. [49]. In its Motion *in Limine*, Defendant seeks the exclusion of three categories of evidence. ECF No. [33].

Based on the parties' briefings and the evidence in the record, the following facts are not genuinely in dispute unless otherwise noted.

Plaintiff is a black woman, who served as a real estate manager for Broward Health. Plaintiff was hired on December 18, 2018 to fill a newly created Real Estate Manager position and remained employed in that role until her termination on February 18, 2022. *See* SMF, ECF No. [26] at ¶¶ 4, 12. In February 2021, Broward Health promoted Melinda Graves, a Caucasian woman, to the position of Director of Real Estate. *Id.* at ¶ 22. Graves thereafter became Plaintiff's supervisor. *Id*. Melinda Graves started supervising Plaintiff until Plaintiff's termination in February 2022. *Id.*

At her deposition, Plaintiff testified that Graves made demeaning and condescending comments during the time she supervised Plaintiff. ECF No. [27] at 115, 125-26. Graves

repeatedly used profanity throughout their interactions. *Id.* at 115. Once, Graves made a comment about "black people lik[ing] their potato salad a certain way." *Id.* at 120-21. This occurred after Graves took a potato salad to one of her son's football games "which was majority black people" and felt her potato salad "wasn't the one that those individuals preferred." *Id.* at 122. The comment occurred prior to Graves being Plaintiff's supervisor. *Id.* at 121-22. When asked if, other than the potato salad statement, "Graves made any other statement that you would consider to be racial in nature or derogatory based on race[,]" Plaintiff answered "No." *Id.* at 123. Plaintiff told Clark and Human Resources ("HR") about the inappropriate comments and "hostile environment" due to Graves, to no avail. *Id.* at 125-26. Plaintiff also reported to Graves other discriminatory remarks made by another employee. *Id.* at 127. Graves first mentioned that she would talk to the employee, although it is unclear if she did. *Id.* at 127-29. When the remarks occurred again and Plaintiff emailed Graves to report the employee, Graves left Plaintiff's email unanswered. *Id.* at 127.

Ultimately, Graves gave Plaintiff a failing performance review in August 26, 2021, and placed Plaintiff on a Performance Improvement Plan. Graves Affidavit, ECF No. [29] at ¶¶ 20, 21; Plaintiff 2021 Evaluation, ECF No. [27-22] at 8. Plaintiff disputed her performance review by sending two Amendments to HR. Amendment A, ECF No. [27-25]; Amendment B, ECF No. [27-26].[2] Following receipt of Plaintiff's Amendments, HR removed the Performance Review's negative comments about Plaintiff being nonresponsive to emails and phone calls. ECF No. [27] at 169. In contrast to her 2021 Evaluation by Graves, Plaintiff's managers gave her a "passing

---

[2] According to Plaintiff, "Attachment A is answering to each individual section on the annual review. My response to that section, Section 3.4, Section 4.2, Section 9 1 & 3. And Attachment B is summarizing overall everything." ECF No. [27] at 166.

score" in her 2019 and 2020 performance reviews. ECF Nos. [27-18] at 5, [27-21] at 5, [27-22] at 8.[3]

Plaintiff identifies Gerardo Arguello, the other Real Estate Manager in the Real Estate Department, as a similarly situated comparator and describes Arguello as a "white-Hispanic" man. ECF No. [10] at 18; ECF No. [28] at 44-45. Plaintiff testified that Graves treated her and Arguello differently. Graves "basically ignored me, isolated me… We would get on calls, Team calls, and they would have conversations that I was not included, didn't know anything about any of the information that they were speaking on. A lot of times I would have to hear about things via Gerardo [Arguello]." ECF No. [27] at 105. Moreover, Plaintiff testified that Graves:

> didn't respond sometimes -- well, not -- most of the time to my emails or my calls, she missed or rescheduled a lot of our meetings that we were supposed to have. They either never happened, or she rescheduled them and she'll cut them at a fraction of time, limiting her communication with me as much as possible

*Id.* at 106. Plaintiff estimates that two to three meetings were scheduled over the six months Graves and Plaintiff worked together, and many times Plaintiff did not get a response from Graves. *Id.* at 107. Unlike Plaintiff, Arguello never took FMLA leave.

Defendant argues that Arguello is an inadequate comparator, as he had a stellar performance as opposed to Plaintiff. To support its claim of Plaintiff's purported substandard performance, Defendant attaches three Affidavits: (1) Plaintiff's Manager Graves, *see* ECF No. [29], along with Plaintiff's 2021 performance review, ECF No. [29-2]; (2) Senior Vice President of Operations David Clark, see ECF No. [30]; and (3) former Manager of the Real Estate Department Watkins, ECF No. [31]. Graves indicates that she did "not believe that Robin met performance expectations and [she] gave her a rating that accurately reflected her performance" in

---

[3] Plaintiff points to HR attending Plaintiff's 2021 review and not Arguello's review as discriminatory, ECF No. [27] at 106. As Graves explained in her Affidavit, this was because Plaintiff was placed on a performance improvement plan and Arguello was not. ECF No. [29] at ¶ 29.

her 2021 evaluation. ECF No. [29] at ¶ 23. This low score required the implementation of a Performance Improvement Plan. *Id.* at ¶¶ 26, 27; *see also* 2021 Performance Improvement Plan, ECF No. [27-23]. In contrast, Arguello "exceeded expectations" and received a corresponding score, and was never required to be placed on a Performance Improvement Plan. ECF No. [29] at ¶¶ 24, 25.

To further support Plaintiff's low performance, Defendant refers to previous Evaluations, which pre-date Graves's supervision of Plaintiff. Clark testified he previously put Plaintiff on a Performance Improvement Plan in 2019, ECF Nos. [30-1], [27-19], and Plaintiff satisfied those imposed conditions. ECF No. [30] at ¶¶ 9, 10. Plaintiff contends she never saw the Performance Improvement Plan or was never told about it, ECF No. [27] at 136-37. In 2020, Clark rated Plaintiff as meeting expectations in her performance evaluation, but noted there were "growth expectations." ECF No. [30] at ¶ 19; *see* 2020 Performance Review, ECF No. [27-21] at 5. According to Clark, the 2021 Performance Improvement Plan simply reflected the continuation of preexisting issues with Plaintiff's performance. *Id.* at ¶¶ 22-27.

According to Arguello, Graves asked him before Arguello and Plaintiff's performance reviews if:

> … I could give her an idea on what Robin was doing. In fact, she said if I could embellish what Robin wasn't doing, which I said, "Unfortunately, I can only talk to whatever I do. What I can say is that I have no clue what Robin does or doesn't do. That falls on you. You are her supervisor."

ECF No. [28] at 26-27. Arguello further explained:

> I think specifically she wanted me to put it in writing that Robin was not doing anything within the department, that I was carrying all of the load. But even if that was the case, like I told her, "It is up to you to balance the workload, not up to me to say it." And I'm not—You know, so I think that's what she wanted me to say, that I was carrying most of the workload, and not all of the workload; that she wasn't doing her duties; that she was short of incompetent. But, you know, I don't think that was my duty, so I did not write that down. I did not send that email the way she wanted it. I was as honest as I could be, reporting whatever I was asked to

report. And at one point I told her, "I do not know what Robin does. That is up to you. Your guess is as good as mine. I know what I do."

*Id.* at 33.

Arguello testified that Plaintiff "stood up to Graves as far as not being competent to do her job, and [Graves] took that as an affront to her, that Robin did it publicly. And from then on, it was all—I think she became obsessed with getting rid of Robin." *Id.* at 47. Arguello mentions several instances where Plaintiff pushed back against decisions by Graves. *Id.* at 37-38. Arguello describes the conflict as "a clash of—whatever it was—personalities, knowledge." *Id.* at 38. Arguello described Graves stopping by his desk to share negative things about Plaintiff, to his discomfort and "she did not really like Robin Duncan at all. She wanted Robin gone." *Id.* at 39. Arguello testified that he never heard Graves make comments "racial in nature[.]" *Id.* at 29. He did not believe her mistreatment of Plaintiff was "based on race. It's just based on the vial [sic] human being that she is." *Id.* at 47.

Record evidence includes numerous emails written by Arguello and sent to Graves, all forwarded on September 8, 2021. That day, Arguello forwarded to Graves previous emails from Plaintiff to criticize Plaintiff's delegations of tasks to him or capacity to complete her work. ECF No. [29-1]. Arguello subsequently walked back the significance of these emails, explaining Graves was asking him to overemphasize issues about Plaintiff's performance: "I wish I could tell you some of those emails were a hundred percent accurate, but you know what? I—and this is on me— I probably did the human thing and went along with [Graves] in some things." *Id.* at 48. Notwithstanding, Arguello detailed frustrations with Plaintiff's technical abilities, delegation of duties, and the division of labor between them. *Id.* at 78. But despite his impression that Plaintiff had deficiencies in "basic math, technical skills, analysis," he testified that in "everything else she

would actually excel." *Id.* at 78. Finally, Arguello testified that the Department was undergoing a

reorganization, which led to an imbalance between his workload and Plaintiff's workload:

> I was more reorganizing the department. So basically I was doing more, but it
> was—I think it was just a passing moment. Once the department was restructured,
> I think Robin would have been back to normal duties. At that time when [Graves]
> asked, yeah, I was probably doing more just because I had the know-how on the
> technical side on how to restructure the department. But part of that restructure was
> also to reassign specific duties to Robin and assign her specific buildings and a
> specific number of leases.

*Id.* at 34-35. Even if "at the moment I was doing more, I was carrying the load, just it was

a natural—I think it was a natural workflow." *Id.* at 35.

On October 21, 2021, Plaintiff was diagnosed by her primary care practitioner for sinus

tachycardia, primary hypertension, and heart palpitations. ECF No. [27-5]. Plaintiff also started

seeing a therapist, who diagnosed her with anxiety. ECF No. [27] at 49, 52. A psychiatric

evaluation with another provider later confirmed the anxiety diagnosis in early March 2022, ECF

No. [27] at 62-63, ECF No. [27-8]. Plaintiff was prescribed medication for anxiety and for heart

palpitations. ECF Nos. [27] at 71, [27-8]. Plaintiff testified that the anxiety prevented her from

sleeping and "being a good parent[,]" making her more stressed and irritated with her daughter.

ECF No. [27] at 190.

On October 22, 2021, Plaintiff advised that she would be out on sick leave. ECF No. [30]

at ¶ 28. She sought—and her doctor recommended—FMLA leave. ECF No. [27-14]. Her primary

care physician filled out the appropriate paperwork for FMLA leave, as provided by Broward

Health's HR Department. *Id*. On the form, her primary care practitioner wrote that he diagnosed

Plaintiff with sinus tachycardia and hypertension, as well as an anxiety disorder. *Id*. Plaintiff's

request for a leave was approved through December 9, 2021. ECF No. [27] at 81. On December

8, 2021, Plaintiff had an appointment with her cardiologist, who explained that she needed

additional time off work. ECF No. [27] at 81. Plaintiff was thereafter provided the full twelve (12)

week allotment from October 22, 2021 through January 13, 2022 and Broward Health notified Plaintiff that her FMLA leave ran out on January 14, 2022, ECF No. [27-17]. At that point, Plaintiff felt she was unable to return to work, and she started the process of applying for leave under the ADA. ECF No. [26] at ¶ 41; ECF No. [27] at 83-84. A medical evaluation on February 7, 2022 confirmed Plaintiff's prior diagnosis for sinus tachycardia and anxiety, and her medication prescription was refilled. ECF No. [27-2]. Plaintiff asked for an extension of her leave under the ADA for further evaluation by a doctor on March 11, 2022. ECF No. [27] at 84.

On January 11, 2022, Plaintiff gave notice to HR that she was unable to return to work and would be reexamined by a doctor on March 11, 2022. ECF No. [27-17] at 1. Plaintiff submitted updated FMLA documentation and a Reasonable Accommodation Request form which stated that "Due to my current mental health status, I can not work in such a hostile environment." ECF No. [27-15]. The form included a note from her physician, who explained that Plaintiff would be "unable to perform all job functions" and "unable to handle the stress of the job" due to anxiety. ECF No. [27-14] at 2. Plaintiff's physician noted that the duration of Plaintiff's condition was "unknown at this time." ECF No. [27-14] at 2. He indicated that Plaintiff would be re-evaluated by a doctor on March 11, 2022. *Id.* at 3.

On January 18, Broward Health granted Plaintiff additional leave under the ADA until February 15, 2022. ECF No. [27-16]; ECF No. [27] at 87. However, Broward Health denied Plaintiff's request to extend her leave until March 11, 2022 as this would "cause an undue burden to Broward Health's departmental business needs." ECF No. [27-16] at 2. When Plaintiff indicated she was unable to return to work on February 15, 2022 for health reasons, Broward Health terminated her employment on February 18, 2022. ECF No. [27] at 87-88.

Defendant contends that Plaintiff's termination was not due to disciplinary reasons. In her Affidavit, Graves explained that Plaintiff was terminated "because she was unable to return to work or even provide a definitive return to work date after an approximate four-month absence." ECF No. [29] at ¶ 51. Graves stated that "we, as a real estate department, were drowning with the workload" due to Plaintiff's leave. *Id.* Clark explained:

> Ms. Duncan's separation was non-disciplinary in nature. Despite ongoing concerns with her work performance, Ms. Duncan was separated solely because of her inability to return to work. For this reason, Ms. Duncan was advised she was eligible to reapply for a position with Broward Health in the event her situation improved. If Ms. Duncan had sought reemployment as a real estate manager, she would have been eligible for rehire. For reasons unknown, it took several weeks for the role to be posted and based on the applicant pool we received, she very likely would have been rehired.

ECF No. [30] at ¶¶ 40-41.

On April 19, 2022, Plaintiff filed a Charge of Discrimination with the EEOC alleging federal race discrimination, disability discrimination, and retaliation claims. ECF No. [27-4]. Plaintiff alleges her termination was due to racial discrimination, disability discrimination, and in retaliation for taking FMLA leave.

## II.  LEGAL STANDARD

### A.    Summary Judgment

A court may grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citations to materials in the record, including depositions, documents, affidavits, or declarations. *See* Fed. R. Civ. P. 56(c). "A factual dispute is 'material' if it would affect the outcome of the suit under the governing law, and 'genuine' if a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee*

*Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).

The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Instead, "the non-moving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in the non-moving party's favor. *Shiver*, 549 F.3d at 1343. Even "where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from those facts," summary judgment may be inappropriate. *Warrior Tombigbee Transp. Co., Inc. v. M/V Nan Fung*, 695 F.2d 1294, 1296 (11th Cir. 1983).

This Court may not decide a genuine factual dispute at the summary judgment stage. *Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990). "[I]f factual issues are present, the Court must deny the motion and proceed to trial." *Warrior Tombigbee*, 695 F.2d at 1296.

## B.   *McDonnell Douglas* Burden-Shifting Framework

In the absence of direct evidence of discrimination, the Court applies the burden-shifting framework established by the Supreme Court in *McDonnell Douglas* to: (a) Title VII claims for

racial discrimination, (b) ADA discrimination cases; and (c) FMLA retaliation cases. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800 (1973). The Supreme Court established the *McDonnell Douglas* burden-shifting framework "to allow plaintiffs who lack direct evidence of discrimination to nonetheless obtain fair scrutiny of their claims that they have been discriminated against in the workplace—that is, as a delicate balance between employers' rights to make legitimate personnel decisions and employees' rights to be free from those discriminatory practices…" *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1233 (11th Cir. 2019) (Rosenbaum, J., concurring).

"Under this framework, a plaintiff must first establish a prima facie case of discrimination. Next, the defendant must articulate a legitimate, non-discriminatory reason for the challenged employment action. If the defendant articulates one or more such reasons, the plaintiff is afforded an opportunity to show that the employer's stated reason is a pretext for discrimination." *Sims v. MVM, Inc*., 704 F.3d 1327, 1332 (11th Cir. 2013) (citations omitted). "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Id.* at 1333; *see also E.E.O.C. v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1273 (11th Cir. 2002).

A plaintiff's burden to establish a prima facie case "is not onerous" and Plaintiff must simply establish discriminatory treatment by a preponderance of the evidence. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981). "The employer's initial showing, just as the plaintiff's, is a low bar to hurdle." *Flowers v. Troup Cnty., Ga., Sch. Dist*., 803 F.3d 1327, 1336 (11th Cir. 2015). At the next step, "[t]he burden placed on the employer is only an evidentiary one: a burden of production that 'can involve no credibility assessment.'" *Id.* at 1336 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993)).

However, to establish pretext and avoid summary judgment at the next step of the *McDonnell Douglas* framework, the plaintiff "must present 'significant probative evidence[.]'"

*Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir. 2022), cert. denied sub nom. *Owens v. Georgia Governor's Off. of Student Achievement*, 143 S. Ct. 2465, 216 L. Ed. 2d 434 (2023) (quoting *Mayfield v. Patterson Pump Co.*, 101 F.3d 1371, 1376 (11th Cir. 1996)). At that stage, "the inquiry 'proceeds to a new level of specificity,' in which the plaintiff must show that the proffered reason really is a pretext for unlawful discrimination." *Joe's Stone Crabs, Inc.*, 296 F.3d at 1273. More specifically, "[i]f a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1326 (11th Cir. 2011). To establish pretext, a plaintiff can reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)).

i.   **Title VII Claim**

When addressing a Title VII claim for racial discrimination at the summary judgment stage, a Court applies the burden-shifting framework established in *McDonnell Douglas* in the absence of direct evidence of discrimination. 411 U.S. at 792; *see also Monroe v. Fla. Dep't of Corr.*, 793 F. App'x 924, 926 (11th Cir. 2019). "When, as here, the plaintiff claims that his employer discharged him on account of his race, he must establish four elements." *Lockheed-Martin Corp.*, 644 F.3d at 1325. To establish a prima facie case under Title VII, a plaintiff must demonstrate that they (1) belong to a protected class; (2) were subjected to an adverse employment action; (3) were

qualified to perform the job in question; and (4) their employer treated "similarly situated" employees outside of their protected class more favorably. *See Lewis*, 918 F.3d at 1220-1221.

### ii.      FMLA Claim

In the absence of direct evidence of retaliation, a Court must review an FMLA retaliation claim under the *McDonnell Douglas* burden-shifting framework. *See Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017); *Lapham v. Walgreen Co.*, 88 F.4th 879, 889 (11th Cir. 2023). "When a plaintiff asserts a claim of retaliation under the FMLA, in the absence of direct evidence of the employer's intent, we apply the same burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), for evaluating Title VII discrimination claims." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1207 (11th Cir. 2001). To state a prima facia case for FMLA retaliation at the summary judgment stage, an employee must raise a material issue of fact that (1) he/she availed himself of a protected right under the FMLA; (2) he/she suffered an adverse employment decision; and (3) there is a causal connection between the protected activity and the adverse employment decision. *Parris v. Miami Herald Pub. Co.*, 216 F.3d 1298, 1301 (11th Cir. 2000).

"[T]o succeed on a retaliation claim, an employee must demonstrate that his employer intentionally discriminated against him in the form of an adverse employment action for having exercised an FMLA right*." Strickland*, 239 F.3d at 1207. In other words, a plaintiff bringing a retaliation claim must show that their employer's actions "were motivated by an impermissible retaliatory or discriminatory animus." *Id.* at 1207.[4]

---

[4] "[T]he FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against

### iii.     ADA Discrimination Claim

The *McDonnell Douglas* framework also applies to ADA discrimination claims established through circumstantial evidence. In the ADA discrimination context, a plaintiff must establish they are: (1) disabled; (2) a qualified individual; and (3) were subjected to unlawful discrimination because of disability, to make out a prima facie case. *See, e.g., Word v. AT&T*, 576 F. Appx. 908, 918 (11th Cir. 2014) (applying *McDonnell Douglas* to ADA discrimination claim); *Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1305 (11th Cir. 2000). To be disabled under the ADA, Plaintiff must demonstrate that she had (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1); *see also Fikes v. Wal-Mart, Inc.*, 322 F. App'x 882, 883-84 (11th Cir. 2009).

### C.     Motions *in Limine*

"In fairness to the parties and their ability to put on their case, a court should exclude evidence *in limine* only when it is clearly inadmissible on all potential grounds." *United States v. Gonzalez*, 718 F. Supp. 2d 1341, 1345 (S.D. Fla. 2010). "The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground." *Id.* "Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context." *In re Seroquel Prods. Liab. Litig.*, Nos. 6:06-md-1769-Orl-22DAB, 6:07-cv-15733-Orl-22DAB, 2009 WL 260989, at *1 (M.D. Fla. Feb. 4, 2009). Likewise, "[i]n light of the preliminary or preemptive nature of motions *in limine*, 'any party may seek reconsideration at trial in light of the evidence

---

him because he engaged in activity protected by the Act." *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206 (11th Cir. 2001). At issue here is a retaliation claim.

actually presented and shall make contemporaneous objections when evidence is elicited.'" *Holder v. Anderson*, No. 3:16-CV-1307-J-39JBT, 2018 WL 4956757, at *1 (M.D. Fla. May 30, 2018) (quoting *Miller ex rel. Miller v. Ford Motor Co.*, No. 2:01CV545FTM-29DNF, 2004 WL 4054843, at *1 (M.D. Fla. July 22, 2004)); *In re Seroquel Prod.*, 2009 WL 260989, at *1 ("The court will entertain objections on individual proffers as they arise at trial, even though the proffer falls within the scope of a denied motion *in limine*." (citing *United States v. Connelly*, 874 F.2d 412, 416 (7th Cir. 1989))).

Evidence is admissible if relevant, and evidence is relevant if it has any tendency to prove or disprove a fact of consequence. Fed. R. Evid. 401, 402; Advisory Comm. Notes, Fed. R. Evid. 401 ("The standard of probability under the rule is 'more probable than it would be without the evidence.'"); *United States v. Patrick*, 513 F. App'x 882, 886 (11th Cir. 2013). A district court may exclude relevant evidence under Rule 403 if "its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Rule 403 is an extraordinary remedy which the district court should invoke sparingly, and the balance should be struck in favor of admissibility." *Patrick*, 513 F. App'x at 886 (citing *United States v. Lopez*, 649 F.3d 1222, 1247 (11th Cir. 2011); *United States v. Alfaro-Moncada*, 607 F.3d 720, 734 (11th Cir. 2010)). Rule 403's "major function . . . is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Grant*, 256 F.3d 1146, 1155 (11th Cir. 2001). The movant has the burden to demonstrate that the evidence is inadmissible. *Gonzalez*, 718 F. Supp. 2d at 1345.

## III. DISCUSSION

### A. Racial Discrimination under Title VII –Count III

####     i.     Prima Facie Case of Discrimination

The Court first turns to Plaintiff's claim for racial discrimination under Title VII. Plaintiff must first clear the low hurdle of making out a prima facie case of discrimination under Title VII. Duncan must demonstrate that she (1) belongs to a protected class; (2) was subjected to an adverse employment action; (3) was qualified to perform the job in question; and (4) her employer treated "similarly situated" employees outside of her protected class more favorably. *See Lewis v. City of Union City*, 918 F.3d 1213, 1220-1221 (11th Cir. 2019). "If a prima facie case is met, a rebuttal presumption that the employer acted illegally arises." *Combs*, 106 F.3d at 1527–28.

The fourth requirement for a "similarly situated" employee was clarified by the Eleventh Circuit in *Lewis*, 918 F.3d at 1218. In *Lewis,* the Eleventh Circuit ruled *en banc* that "a plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were "similarly situated in all material respects*." Id.* at 1218. The Court explicitly rejected its occasional iteration of the "similarly situated" employee as requiring a nearly-identical employee. *Id.* at 1224-5. In the real world, the *Lewis* court found that a "nearly-identical test is too strict" given that perfect identity between an employee and a comparator is "practically speaking… a non-starter." *Id.* at 1224. The Court identified several factors that ordinarily would help a court find an employee as "a similarly situated comparator" such that an employee:

> • will have engaged in the same basic conduct (or misconduct) as the plaintiff, *see, e.g., Mitchell v. Toledo Hosp*., 964 F.2d 577, 580, 583 (6th Cir. 1992) (holding that a plaintiff terminated for "misuse of [an employer's] property" could not rely on comparators allegedly guilty of "absenteeism" and "insubordination");
> • will have been subject to the same employment policy, guideline, or rule as the plaintiff, *see, e.g.*, *Lathem*, 172 F.3d at 793 (holding that a plaintiff's proffered comparators were valid where all were subject to the same "workplace rules or policies");

• will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff, *see, e.g., Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989) (observing that "disciplinary measures undertaken by different supervisors may not be comparable for purposes of Title VII analysis"); and

• will share the plaintiff's employment or disciplinary history, *see, e.g., Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304 (6th Cir. 2016) (explaining that "[d]ifferences in experience and disciplinary history" can disqualify a plaintiff's proffered comparators).

*Id.* at 1227–28. However, "the plaintiff and her comparators need not be 'similar in all but the protected ways.'" *Id.* at 1227 (citation omitted).

Defendant does not contest that Plaintiff satisfies the first and second requirement of her prima facie case for race discrimination. ECF No. [25] at 6. Rather, Defendant argues that Plaintiff's claim fails because she was not qualified to perform the job at the time of her separation under the third factor and cannot identify a similarly situated comparator under the fourth factor. *Id.* at 6-9. Plaintiff's inability to return to work for health reasons rendered her unqualified. *Id.* at 6.

Plaintiff responds that she was qualified for her position, as she properly performed the essential functions of the job. ECF No. [49] at 8-9. Plaintiff also argues that Arguello was a similarly situated comparator because they held the same position, shared the same workload, and reported to the same supervisor. *Id.* at 9. Defendant replies that Arguello is not a proper comparator, since he did not "engage in the same basic conduct," including missing four months of work without a definitive return to work date, nor "share Plaintiff's employment history." ECF No. [50] at 6 (quoting *Lewis*, 918 F.3d at 1228-29).

Plaintiff meets her low burden to establish she was qualified "to perform the job in question." *See Lewis*, 918 F.3d at 1220-21. First, Defendant would have rehired Plaintiff for the same job after her separation. In his Affidavit, Clark states that Plaintiff "very likely would have been rehired" if she had reapplied. ECF No. [30] at ¶ 41. He insists that "[d]espite ongoing

concerns with her work performance, Ms. Duncan was separated solely because of her inability to return to work. *Id.* at ¶ 40. A plaintiff's burden to establish a prima facie case "is not onerous." *Burdine*, 450 U.S. at 253.

However, Plaintiff does not meet her burden of establishing that Plaintiff's employer treated "similarly situated" employees outside of her protected class more favorably, namely Arguello. *See Lewis*, 918 F.3d at 1220-21. Some of the factors for a comparator in *Lewis* are met here. Arguello and Plaintiff were both employees at the same time and under the same supervisor, Graves.[5] Both "shared the workload pretty much evenly" when Arguello first started. ECF No. [28] at 16.

However, there are differences between Arguello and Plaintiff in two material respects. First, Arguello did not take four months of leave, so he did not engage in the "same basic conduct" as Plaintiff under *Lewis,* 918 F.3d at 1227–28. Second, Plaintiff and Arguello do not share the same or similar "employment or disciplinary history." *Lewis,* 918 F.3d at 1227–28. Plaintiff and Arguello are not similarly situated in their employment history. Plaintiff was placed on a Performance Improvement Plan in 2019, ECF Nos. [30-1], [27-19], and in 2021, ECF No. [27-23]. Though Plaintiff received a passing score on her 2020 evaluation, her performance review did note that "there are growth expectations for Ms. Duncan this fiscal performance year." ECF No. [27-21] at 5. In contrast, Arguello "exceeded expectations" in numerous domains and received the corresponding score in his 2021 performance review. ECF No. [29] at ¶¶ 24, 25; *see* Arguello Performance Improvement Plan, ECF No. [29-3] at 6. Arguello was never subject to placement on a Performance Improvement Plan. Though "the plaintiff and her comparators need not be 'similar in all but the protected ways,'" *Lewis,* 918 F.3d at 1227, here the two material differences between

---

[5] Arguello was hired in May 2020 to help relieve the workload of the Real Estate Department, including Plaintiff's workload. *See* Arguello Deposition, ECF No. [28] at 12.

Plaintiff and Arguello are disqualifying. Defendant is correct that Arguello is not an adequate comparator because "he did not engage in the same substandard work performance and does not share Duncan's substandard performance history[,]" nor did he go out on leave for four months. ECF No. [25] at 8.[6]

Plaintiff fails to establish that Arguello is an adequate comparator for Plaintiff under the factors laid out in *Lewis*, 918 F.3d at 1220-1221. Under the first step of the *McDonnell Douglas* framework, Plaintiff fails to make out a prima facie case of racial discrimination. Accordingly, the Court does not move to the presumption rebuttal and pretext for discrimination under *McDonnell Douglas*.[7] Defendant is entitled to summary judgment on Plaintiff's Title VII claim for race discrimination.

---

[6] The record does include some evidence of Graves' hostility toward Plaintiff. Arguello testified that Graves asked him ahead of Arguello's and Plaintiff's performance reviews "if I could embellish what Robin wasn't doing[,]" which he refused to do. ECF No. [28] at 26. Arguello testified: "I think specifically she wanted me to put it in writing that Robin was not doing anything within the department, that I was carrying all of the load." ECF No. [28] at 33. In Arguello's words, Graves "did not really like Robin Duncan at all. She wanted Robin gone." *Id.* at 39. However, while distasteful, there is sufficient evidence of Plaintiff's low performance prior to her supervision by Graves, namely Plaintiff's prior mixed performance reviews in 2019 and 2020 and Plaintiff's 2019 Performance Improvement Plan. ECF Nos. [30-1], [27-19].

[7] If the Court had reached the next steps of the *McDonnell Douglas* burden-shifting framework. Defendant would have met its low burden of production of proffering a legitimate reason for the adverse action. Defendant argues that Plaintiff was fired due to the burden imposed on Defendant to reallocate her work during her absence. ECF No. [25] at 16-18. By virtue of pointing to a legitimate reason for the adverse action, Defendant clears this "low hurdle" by articulating legitimate, non-discriminatory reasons for the challenged employment action. *Lapham*, 88 F.4th at 889. On the next step of the analysis, Plaintiff would have failed to establish a genuine dispute of material fact that Defendant's proffered reason is pretextual. Plaintiff adduces no evidence that would allow a fact-finder to infer that race discrimination was the "real reason for the employer's actions." *Wesley*, 776 F. App'x at 644. In her deposition, Plaintiff mentions a comment by Graves that "she didn't know that black people like their potato salad a certain way[.]" ECF No. [27] at 121. Plaintiff explained that comment occurred prior to Graves being her supervisor. *Id.* at 122. When asked if, other than the potato salad statement, "Graves made any other statement that you would consider to be racial in nature or derogatory based on race[,]" Plaintiff answered "No." *Id.* at 123. Accordingly, Plaintiff's claim for racial discrimination would have also failed at the pretext stage.

**B.  FMLA Retaliation: Count V**

    **i.**       **Prima Facie Case of FMLA Retaliation**

The Parties do not argue that there is direct evidence of FMLA retaliation in the record. The Court therefore turns to the first step of the *McDonnell Douglas* burden-shifting framework: whether Plaintiff established a prima facie case of FMLA retaliation.[8] To establish her prima facie case of retaliation under the FMLA, Plaintiff must establish (1) she engaged in FMLA-protected activity; (2) she was subjected to a materially adverse action; and (3) there is some causal relation between the activity and the adverse action. *See Strickland*, 239 F.3d at 1207; *Lapham*, 88 F.4th at 889. The Eleventh Circuit has recently clarified "that the proper causation standard for FMLA … retaliation claims is but-for causation." *Lapham*, 88 F.4th at 893. But-for causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Id.* at 894.

It is undisputed that Plaintiff (1) engaged in FMLA-protected activity — taking FMLA leave — and (2) was subjected to a materially adverse action, her termination a month after the end of that leave. However, the Parties disagree about whether (3) there is some causal relation between the FMLA leave and Plaintiff's termination. Defendant argues that Plaintiff cannot establish a prima facie case of FMLA Retaliation for being terminated during her FMLA leave because she was terminated after the expiration of her leave: nothing in the record would allow for the inference of a causal connection between her termination and the fact that she took leave under

---

[8] "[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of" some impermissible factor constitutes direct evidence of discrimination." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1270 (11th Cir. 2017). The Eleventh Circuit found that an employer's comments about the timing of FMLA leave or that an employee abused and misused his FMLA leave do not constitute direct evidence of retaliation. *Id.* at 1271.Th comments might suggest but do not prove discriminatory motive, and thus are "better considered as circumstantial evidence of retaliation." *Id.*; *see also Lapham v. Walgreen Co.*, 88 F.4th 879, 890 (11th Cir. 2023).

the FMLA. ECF No. [25] at 14-15. Plaintiff responds that her claim was for retaliation based on the FMLA, not a claim for interference, so that she does not need to assert she was terminated during her FMLA leave but simply in retaliation of it. ECF No. [49] at 6-7. Plaintiff argues temporal proximity between Plaintiff's termination and taking FMLA leave is enough to infer causality under *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273, 2001). ECF No. [49] at 6-7. Moreover, Graves made disparaging comments about Plaintiff's leave. *Id.* at 7.

Plaintiff is correct that "[t]he general rule is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Labrousse v. Caribbean Airmail, Inc.,* 09–23529–CIV, 2011 WL 3516029, at *6 (S.D.Fla. Aug.11, 2011) (citing *Brungart v. BellSouth Telecomms.,* Inc., 231 F.3d 791, 799 (11th Cir.2000)). "But mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper Lighting, Inc.,* 506 F.3d 1361, 1364 (11th Cir.2007) (quoting *Breeden,* 532 U.S. at 273). "[T]emporal proximity, for the purpose of establishing the causation prong of a prima facie case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Gulf Coast Health Care of Delaware*, 854 F.3d at 1272. "A three to four month disparity between the statutorily protected expression and the adverse employment action is not enough." *Thomas*, 506 F.3d at 1364.

Here, Plaintiff was terminated slightly over one month after the end of her FMLA leave. That duration is close enough to establish a "very close" temporal proximity between the adverse employment action and the protected activity. *Id.* It is "sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Labrousse,* 2011 WL 3516029, at *6. Plaintiff has cleared the low hurdle of making out a prima facie case of FMLA retaliation.

## ii.      Presumption Rebuttal

Defendants argue that summary judgment is proper because Plaintiff cannot rebut  as pretext Broward Health's articulated reasons for terminating Plaintiff. ECF No. [25] at 15-6. Defendant contends it had legitimate reasons for terminating Plaintiff, such as "the hardship her absence was causing the department in the context of her admitted inability to return to work after four months or otherwise provide a definitive return to work date." *Id.* at 16. Defendant's position that it fired Plaintiff due to the hardship to the department caused by Plaintiff's absence satisfies its burden of production. "This responsive burden is a simple burden of production that can involve no credibility assessment." *Lapham*, 88 F.4th at 889 (citation omitted).

## iii.      Pretext for Discrimination

The burden then shifts back to Plaintiff to prove by a preponderance of the evidence that the legitimate reason is merely pretext for prohibited, retaliatory conduct. *Lapham*, 88 F.4th at 889. Plaintiff argues that Defendant's stated reason is pretext since there was no undue burden following from her absence and termination. ECF No. [49] at 10-11. Moreover, Graves' disparaging comments about Plaintiff's leave and temporal proximity between her leave and her termination serve as further evidence that she was terminated pursuant to her leave. *Id.* at 7. Defendant replies that Plaintiff's request for accommodation was a request for indefinite leave, which is therefore unreasonable, and entitled Defendant to terminate Plaintiff. ECF No. [50] at 3-4.[9]

---

[9] Defendant argues that Plaintiff is trying to impermissibly restyle her retaliation claim under the FMLA or its ADA discrimination claim as a failure to accommodate claim under the ADA. ECF No. [50] at 3-4. To the extent Plaintiff tries to alter her claims at this stage, such recharacterization is improper. However, the extent of the accommodation made available to Plaintiff is relevant to the determination of whether Plaintiff is qualified under Plaintiff's discrimination claim under the ADA.

Plaintiff must now "meet the employer's proffered reason head-on and rebut it; the plaintiff cannot succeed by merely disputing the wisdom of the employer's reason." *Wesley v. Austal USA, LLC*, 776 F. App'x 638, 644 (11th Cir. 2019). "On summary judgment, the burden is more aptly described as submitting enough evidence that could allow a reasonable jury to find the reasons were pretextual and the adverse action was taken in retaliation for engaging in the protected activity." *Williams v. Polk Cnty. Bd. of Cnty. Commissioners*, No. 8:20-CV-2842-WFJ-SPF, 2022 WL 17082112, at *21 (M.D. Fla. Nov. 18, 2022), aff'd, No. 23-10206, 2024 WL 835242 (11th Cir. Feb. 28, 2024), and aff'd, No. 23-10206, 2024 WL 835242 (11th Cir. Feb. 28, 2024). Plaintiff's FMLA claim fails at this stage.

Plaintiff fails to produce sufficient evidence to refute Defendant's contention that Plaintiff "was separated solely because of her inability to return to work." Clark's Affidavit, ECF No. [30] at ¶ 40. On January 11, 2022, Plaintiff gave notice to HR that she was unable to return to work when her FMLA leave expired on January 14, 2022. ECF No. [27-17] at 1. Plaintiff submitted updated FMLA documentation and a Reasonable Accommodation Request form which stated: "Due to my current mental health status, I can not work in such a hostile environment." ECF No. [27-15]. On the Reasonable Accommodation Request Form, when asked to identify "the accommodation that you are requesting and how it will assist you in performing the essential functions of your job[,]" Plaintiff wrote "N/A". ECF No. [27-15] at 1. The Form included a note from her physician, who explained that Plaintiff would be "unable to perform all job functions" and "unable to handle the stress of the job" due to anxiety. ECF No. [27-14] at 2. In an additional Form, Plaintiff's physician noted that the duration of Plaintiff's condition was "unknown at this time." ECF No. [27-14] at 2. He indicated that Plaintiff would be reevaluated on March 11, 2022. *Id.* at 3. HR granted an extension of leave to Plaintiff until February 15, 2024 under the ADA but

denied an extension until March 11, 2022 as this would "cause an undue burden to Broward Health's departmental business needs." ECF No. [27-16] at 2. It was only when Plaintiff declined to return to work on February 15, 2024 that Defendant terminated her. ECF No. [27] at 87-88. The record supports Defendant's proffered reason for Plaintiff's termination.

To rebut Defendant's reason for her termination, Plaintiff points to negative remarks made by Graves when Plaintiff was out on FMLA leave, as testified to by Arguello:

> Q: Have you ever heard Ms. Graves make any comments regarding somebody taking FMLA leave that you believe to be negative in nature?
> A: Yes.
> Q: And what—can you explain what—
> A: Typically, Robin Duncan—when Robin was on the FMLA, the family leave, she would probably make the comments to me directly, saying, you know, "Wow, she's on the"—you know, she made it sound like it was fake, that she didn't believe it was something real. And while she's at it – and she's doing this, but she's doing— you know, we can't do anything in the department.
> So it came around talking about what -- how the department would be reorganized in the future, and her comments would be, "Well, I can't do anything because I have somebody in this, quote/unquote, family leave," which was her comment then. I believe it was a negative quote.

ECF No. [28] at 30-31. Arguello testified that Graves stopped at his work desk to "vent[]" about Plaintiff, adding: "[Graves] was always venting about the family leave." *Id.* However, Graves' skepticism as to Plaintiff's FMLA leave did not prevent Defendant from granting Plaintiff an additional month of leave after the expiration of her FMLA leave. ECF No. [27-16] at 2. In addition, Defendant offered Plaintiff a return-to-work date of February 15, 2022. *Id.* It was only when Plaintiff failed to return to work at that time that she was terminated.

Accordingly, Plaintiff fails to establish a genuine dispute of material fact as to whether retaliation was the real reason for her termination, where the record evidences that Defendant terminated Plaintiff due to her inability to return to work. Plaintiff "cannot succeed by merely disputing the wisdom of the employer's reason." *Wesley*, 776 F. App'x at 644. Plaintiff must

instead "present significant probative evidence" to establish pretext and avoid summary judgment at this stage of the *McDonnell Douglas* framework. *Owens*, 52 F.4th at 1338. Plaintiff fails to do so and Defendant is entitled to summary judgment on the FMLA Retaliation claim.

## C. ADA Disability Discrimination: Count I

### i. Prima Facie Case of ADA Discrimination

The Court applies the *McDonnell Douglas* burden-shifting framework to claims for discrimination under the ADA. The Court first turns to whether Plaintiff establishes a prima facie case of discrimination under the ADA. To do so, Plaintiff must demonstrate she: (1) is disabled; (2) is a qualified individual; and (3) was subjected to unlawful discrimination because of her disability. *See e.g. Word*, 576 F. Appx. at 918 (applying *McDonnell Douglas* to ADA discrimination claim); *Florida Power & Light Co.*, 205 F.3d at 1305. Plaintiff need only establish that "different treatment was given to someone who differs in regard to the relevant personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999). To be disabled under the ADA, Plaintiff must demonstrate that she had (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as having such an impairment. 42 U.S.C. § 12102(1); *see also Fikes*, 322 F. App'x at 883-84. "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). Under the ADA, a "qualified individual" is someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111 (8). "Thus, if [the plaintiff] is unable to perform an essential function of his ... job, even with an accommodation, he is, by definition, not

a 'qualified individual' and, therefore, not covered under the ADA." *Fla. Power & Light Co.*, 205 F.3d at 1305. Reasonable accommodations may include: "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).

On the third factor of the prima facie case, Plaintiff need only establish that "different treatment was given to someone who differs in regard to the relevant personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999). It is only at the pretext stage that Plaintiff must prove that "more probably than not ... the employer took an adverse employment action against him on the basis of a protected personal characteristic." *Id*. at 1291.

### 1.  Plaintiff's Disability under the ADA

The Court first turns to the question of whether the Plaintiff has established the first step of her prima facie case by showing that it is more likely than not that Plaintiff is disabled under the ADA.

Defendant argues that Plaintiff cannot make out a prima facie case of discrimination for her disability because she fails to establish the three requirements to establish disability under the ADA: (1) Plaintiff is not disabled because she was merely experiencing stress when working with Graves; (2) Plaintiff was not qualified to perform her job at the time of separation because she identified no accommodation that would allow her to return to work, and her request for an indefinite leave of absence was "unreasonable" under *Monroe v. Florida Department of Corrections*, 793 F. App'x 924, 927 (11th Cir. 2019); and (3) Plaintiff cannot establish that she was separated from her job because of her disability, because she has no comparator. ECF No. [25] at 9-13.

Plaintiff argues that (1) she was disabled and unable to perform major life activities because anxiety, stress, and heart palpitations interfered with major life activities such as work, sleep, interacting with her daughter, *see* ECF No. [49] at 3-4; (2) Plaintiff was a qualified individual as she could have performed the functions of her job with a reasonable accommodation but was not given that opportunity because Defendant did not engage in the interactive process required by the ADA, *see* ECF No. [49] at 4-5; (3) Plaintiff argues this failure to accommodate is akin to discrimination, and  Defendant conceded the third element of its prima facie case. *Id.* at 4-5. Defendant replies that it did not concede the third element of Plaintiff's prima facie case of disability discrimination. ECF No. [50] at 1. Defendant notes Plaintiff never pled a failure to accommodate theory, never administratively exhausted it, and cannot raise it at this stage. *Id.* at 2. Defendant argues that even if the Court considered Plaintiff's novel failure to accommodate claim, it fails on substantive grounds. *Id.* at 3. Indeed, requests for leave so an employee can work "at some uncertain point in the future are inherently unreasonable." *Monroe*, 793 F. App'x. at 924. Defendant contends Plaintiff failed to meet her burden of identifying a reasonable accommodation.

Plaintiff's heart palpitations, elevated blood pressure, and anxiety interfered with her sleep, ability to work, and strained her parenting skills. Those conditions are sufficient to make out the first step of the prima facie case of establishing a disability under the ADA. A disability is defined as (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such an impairment; or (3) being regarded as so impaired. 42 U.S.C. § 12102. On the first factor, there is a genuine dispute of material fact as to whether Plaintiff has (1) a physical or mental impairment that substantially limits one or more major life activities.[10] "That Plaintiff

---

[10] "In determining whether an impairment substantially limits a major life activity, we consider (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long-term impact, or the expected permanent or long-term impact of or resulting from the

suffered some limitation of a major life activity is not enough; the limitation must be substantial." *Fikes*, 322 F. App'x at 884. Plaintiff experienced her health issues over the course of several months and was placed on medication for those conditions in October 2021. ECF No. [27] at 71-72. In August 24, 2023, Plaintiff was still taking medication for her heart rate. *Id.* at 72. Plaintiff was further prescribed anxiety medication to take as needed. *Id.* at 72.

Plaintiff has put forth evidence of physical and mental impairments that affected activities beyond simply her ability to work under Graves, such as disruption to her sleep.[11] Sleeping is a major life activity. 42 U.S.C. § 12102(2)(A); *see*, *e.g.*, *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *5 (11th Cir. Aug. 24, 2007). This Court has similarly determined that sleep disruption was a major life activity disrupted by a mental impairment. *See*, *Santandreu v. Miami-Dade Cnty.*, No. 10-24616-CIV, 2011 WL 13136161, at *7 (S.D. Fla. Aug. 1, 2011), aff'd, 513 F. App'x 902 (11th Cir. 2013). Plaintiff meets the low burden of establishing she has a disability.[12]

### 2.  Qualified Individual

The Court next addresses the second prong of Plaintiff's prima facie case: whether Plaintiff is a qualified individual. A Court asks two questions: "First, does the individual satisfy the prerequisites for the position; does the individual have sufficient experience and skills, an adequate

---

impairment." *Satchel v. Sch. Bd. of Hillsborough Cnty.*, 251 F. App'x 626, 629 (11th Cir. 2007) (citations omitted).

[11] Despite Defendant's attempt to minimize Plaintiff's condition, it is noteworthy that Arguello — who Defendant, and Graves specifically, uplift as a model employee — notes he developed similar health issues as Plaintiff issues after working under Ms. Graves. "Ms. Graves is not an easy person to work with….She is a liar, she is a bully, she manipulates. And she literally landed me in the hospital where my doctor thought that I had a heart attack because my blood pressure had shot up so high. After I left Broward Health, I'm in perfect health. And one of the reasons—or, no, the reason that I looked for another employment was Ms. Mindy Graves." ECF No. [28] at 42.

[12] In the alternative, Plaintiff established a record of such an impairment. A plaintiff has a "record of" an impairment where he or she "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities." 29 C.F.R. § 1630.2(k)(1); 45 C.F.R. § 84.3(j)(2)(iii). Plaintiff includes forms and doctors' reports about her condition, thus establishing a record of her impairment. ECF Nos. [27-5], [27-7], [27-10], [27-11]], [27-14].

educational background, or the appropriate licenses for the job? Second, can the individual perform the essential functions of the job, either with or without reasonable accommodations?" *Reed v. Heil Co.*, 206 F.3d 1055, 1062 (11th Cir. 2000). Defendant argues that Plaintiff fails on the second question: she could not perform the essential functions of her position, with or without a reasonable accommodation. Plaintiff identified no accommodation that would allow her to return to work, and her request for an indefinite leave of absence was "unreasonable" under *Monroe*, 793 F. App'x at 927. ECF No. [25] at 11. Defendant further points out that "Duncan's own physician explicitly stated she could not perform her job as a real estate manager and Duncan admittedly could not identify any accommodation that would have allowed her to return to work." *Id.* at 11. Plaintiff argues that she was qualified and "could have performed the functions of her job with a reasonable accommodation."[13] ECF No. [49] at 4.

A "qualified individual" is defined under the ADA as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Plaintiff fails to establish she is qualified. First, she indicates she is unable to perform the essential functions of her employment position without a reasonable accommodation. Plaintiff explained that "Due to my current mental status[,] I can not work in such a hostile environment" on her Reasonable Accommodation Request Form. ECF No. [27-15] at 1. Second, she fails to identify a reasonable accommodation that would have allowed her to perform the essential functions of her position. On the Reasonable Accommodation Request Form, when asked to identify "the accommodation that you are requesting and how it will assist you in performing the essential functions of your job[,]" Plaintiff wrote "N/A". ECF No.

---

[13] However, Plaintiff argues that she "was not given that opportunity because Defendant did not engage in the interactive process required by the ADA." ECF No. [49] at 4-5. As Defendant notes, it is too late for Plaintiff to raise a failure to accommodate claim.

[27-15] at 1. Plaintiff's physician further explained that Plaintiff "is unable to work as a real estate manager for Broward Health" but that Plaintiff would be reevaluated on March 11, 2022. ECF No. [27-14] at 3, 4.

Plaintiff does not point the Court, nor does the Court find, an instance where Plaintiff gave Defendant a definite date for her return to work. Requests for indefinite leave are unreasonable under the ADA. *See*, *e.g.*, *Monroe*, 793 F. App'x at 927 ("[T]he ADA covers people who can perform their essential job functions in the present or immediate future, requests for indefinite leave so an employee can work 'at some uncertain point in the future' are inherently unreasonable."). Plaintiff's request for extended leave pending a March 11, 2022 medical re-evaluation was therefore not a reasonable accommodation under *Monroe*. Plaintiff is not qualified under the ADA because she does not point the Court to evidence that "with or without reasonable accommodation" she could perform the "essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

### 3. Unlawful Discrimination Due to Disability

In any event, Plaintiff also fails to establish her prima facie case of discrimination because she fails to establish unlawful discrimination due to disability. Indeed, Plaintiff fails to establish the presence of a comparator. As discussed under the *McDonnell Douglas* analysis for Plaintiff's Title VII claim, Arguello is not a proper comparator for Plaintiff. Plaintiff must establish that "different treatment was given to someone who differs in regard to the relevant personal characteristic." *Wright v. Southland Corp.*, 187 F.3d 1287, 1290 (11th Cir. 1999). Plaintiff fails to do so and thus cannot establish a prima facie case of disability discrimination. Defendant is therefore entitled to summary judgment on Plaintiff's ADA discrimination claim.[14]

---

[14] Had the Court reached the next two steps of the *McDonnell Douglas* burden-shifting framework, Defendant would have met the low burden of articulating a legitimate, non-discriminatory reason for Plaintiff's termination. However,

### D.  FCRA Claims: Counts II and IV

Plaintiff seeks relief under the Florida Civil Rights Act ("FCRA"): Count II for violation of the FCRA for discrimination based on disability and Count IV for violation of the FCRA for discrimination based on race. Defendant argues that Plaintiff's FCRA claims are barred for failure to exhaust administrative remedies, ECF No. [25] at 2-4. Plaintiff concedes that her FCRA claims are barred by the current case law in the Fourth District Court of Appeals. ECF No. [49] at 10. The Court determines that Plaintiff's FCRA claims are barred under *Belony v. N. Broward Hosp*. Dist., 374 So. 3d 5, 8 (4th DCA 2023), as Plaintiff did not reference state law when she filed her Complaint of Discrimination with the EEOC. ECF No. [27-4]. Accordingly, the Court grants summary judgment on Count II and Count IV.

### E.  Motion *In Limine*

Defendant filed a Motion *in Limine*, to which Plaintiff failed to respond, despite the Court issuing an order to show cause. ECF Nos. [33], [35]. Because Defendant is entitled to summary judgment on all claims, the Court denies Defendant's Motion *in Limine* as moot.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.  Defendant's Motion for Summary Judgment, **ECF No. [25]**, is **GRANTED**.

2.  Defendant's Motion *in Limine*, **ECF No. [33]**, is **DENIED AS MOOT**.

3.  The Clerk of Court shall **CLOSE** this case for administrative purposes only.

---

Plaintiff would have failed at the pretext stage, and would have been unable to show "both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr*., 509 U.S. at 515; *see also Calhoun Cnty*., 626 F. App'x at 956. Plaintiff fails to point to evidence to support her claim that discrimination due to her disability was the real reason for Plaintiff's firing. Rather, the record supports that Graves disbelieved Plaintiff truly had a disability. ECF No. [28] at 30-31. Both Graves and Clark testified that they would have rehired Plaintiff if she had reapplied. ECF No. [29] at ¶ 56; ECF No. [30] at ¶ 41. Finally, the case Plaintiff cites for support, *In re Jan. 2021 Short Squeeze Trading Litig*., does not concern pretext under the *McDonnell Douglas* framework. 2022 WL 1522054 at *22.

4. To the extent not otherwise disposed of, any scheduled hearings are **CANCELED**, all pending motions are **DENIED AS MOOT**, and all deadlines are **TERMINATED**.

**DONE AND ORDERED** in Chambers at Miami, Florida, on March 5, 2024.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:

Counsel of Record